## WILLIAMS v. UNITED STATES.

District Court, S. D. New York.
Jan. 31, 1946.

Nathan Baker, of Hokoken, N. J., for plaintiff.

C. B. Dunham, of New York City (C. B. Dunham and Xavier N. Sardaro, both of New York City, of counsel), for defendant.

KNOX, District Judge.

Originally, this suit was brought at law against American Foreign Steamship Corporation, and was tried to a jury before Judge Timmerman. In the course of the trial, it was shown that the defendant was merely a general agent of the War Shipping Administration in operating a Liberty Ship named Thomas R. Marshall on behalf of the United States, and was in no way responsible for the injury that came to the plaintiff. The complaint was accordingly dismissed. Thereupon, plaintiff's at-

torney and counsel for the government, stipulated among other things as follows:—

"4. The transcript of the testimony in the case of Cortez McElroy Williams vs. American Foreign Steamship Corp., civ 27—311, and the depositions of the witnesses in said case are to be submitted to United States District Judge John C. Knox sitting in admiralty for decision and decree, it being stipulated that the parties and their witnesses who testified in the case of Cortez McElroy Williams vs. American Foreign Steamship .Corp., civ 27—311, will be considered as having been called and testified in accordance with the transcript of their testimony and the depositions submitted to the Judge for decision and decree.

"5. There will be no further testimony, argument or briefs to be submitted in this matter, unless requested and directed by the Judge."

From this it will be noted that I must proceed to a decision without the advantage of having heard or seen any of the witnesses, a circumstance that may possibly be detrimental to each of the parties.

Williams now complains against the United States on three causes of action:

(1) That due to negligence on the part of respondent he was caused to slip and fall, thereby sustaining serious injury to his left knee;

(2) That he is entitled to an award for maintenance and cure during the period of his convalescence;

(3) That the Master of the vessel and its other officers, following the accident, failed to furnish libellant with prompt and proper medical care.

As respects this last mentioned claim, I may say at the outset that it is without substantial support in the evidence before me, and will be dismissed.

The facts on which libellant relies to sustain his first and second causes of action are substantially these: On June 20, 1944, he was an able bodied seaman on the Thomas R. Marshall, which then lay at anchor in the port of Civittavecchia, Italy. On that morning, the vessel's motor launch, a boat about 22 feet long and 6 feet wide, had been used to take someone ashore, but Williams did not take part in that activity.

When the launch returned to the ship, which was about to sail, Williams and two other men were ordered to raise the smaller craft to its davits. In the course of this operation, libellant was handling certain hand lines designed to aid the ship's crew in entering the launch in the case of an emergency. The waters through which the ship was to proceed was infested by enemy submarines and, in order to expedite escape from the ship in the event she should be torpedoed, the launch was suspended outboard the vessel's deck.

While engaged in handling the lines, Williams says that it became necessary to step on one of the launch's athwartship seats, which, it is asserted, was spattered with oil, and littered with a quantity of tarred marlin lines. Due to these alleged hazards, he was caused to slip and fall, with the result that his left knee was injured. The seat from which libellant fell is said to have been close by the engine of the launch, and this, it is averred, "was not evidently working right; it was giving out oil." The marlin twine, while properly a part of the launch's equipment, should not, if it was on the seat, have been there. This feature of this case, however, can be disregarded. I state this in view of the following excerpts from Williams' testimony:

"Q. Did the twine have anything to do with your injuries? A. It was right there where I slipped. I could see my feet marks there.

"Q. Did you slip on the twine? A. I do not know whether I stepped on a piece of twine or not.

"Q. You do not know whether the twine or oil caused it? A. I know the oil caused it because my slide mark was there.

"Q. I am trying to find out about the twine, if anything? A. I do not know."

If a quantity of oil was on the seat, it easily could have been a cause of the accident, and it is needless, therefore, to speculate what part, if any, the twine played in bringing about the injury.

Other testimony of Williams is to this effect:

"Q. And after you fell, what happened then? What part of your body did you injure first? A. Well, my knee.

"Q. Which knee. A. My left knee, and they—the mate—

"Q. Did you mention the shoulder? A. Yes.

"Q. Which shoulder is that? A. Right shoulder.

"Q. And then what happened? A. They took me to the mate and the mate gave me first aid.

"Q. What did he do for you? A. Put some methilate and bandaged it up.

"Q. And did you do any work on the vessel? A. I tried to do some but my knee was hurting me so bad I didn't. I had to stay on watch, so the captain thought it did not bother me enough to put anybody in my place, so I stood my wheel watch.

"Q. After you had your injury was there a period of time when you didn't do any work at all, after your injury? A. Yes.

"Q. How long a time would you say? A. A few days.

"Q. Then what happened with reference to your injuries? A. Well, I went back to work, and when it was infected they took me to, I think it was the Ninth Army District Emergency Hospital * * * at Oran. * * *

"Q. Did anything happen to your knee with reference to Oran? A. Yes, I went ashore and I was bound for the dock and my knee locked and just left me down. I just fell completely down, so they took me back to the ship, and the next morning I couldn't get out of bed, so they bandaged me up and took me ashore to the emergency station, and from there in an ambulance up to the hospital. * * * The ship then left without me."

Williams was in the hospital for about a week, and on being asked by its authorities as to whether, in order to reduce the swelling of his knee, he wished to undergo an operation there, or to return to the United States, he chose repatriation, and arrived in Baltimore on August 10, 1944. At that time the knee was both swollen and painful.

Instead of immediately entering a hospital, Williams came to New York in order to secure funds from the American Foreign Steamship Corporation, and succeeded in obtaining $50 or $60. He then reported to the out-patient department of the local Marine Hospital where he was examined by members of its staff and his knee X-rayed. Returning to Baltimore, he entered the Marine Hospital on or about September 5th, and underwent an operation, in which the semilunar cartilages of his left knee were removed. As a result, libellant was confined to the hospital for about three weeks. On being sent to a rest center at Bay Ridge, Maryland, he was able to get about by the use of crutches. After four or five days, he could do so by the aid of two canes. On leaving the rest center, Williams came to New York, and on or about October 28th, secured a position as purser on board a steamer operated by the Waterman Steamship Company, at a salary of $150 per month. He says he could not do the work of a seaman because of pain in the knee, and his inability to go aloft. He would have much preferred to serve as a seaman inasmuch as he could thus make substantial overtime wages, which he could not do in his capacity as a purser. His base pay as a seaman was $100 per month.

Williams continued his work as a purser up until his case came on for trial before Judge Timmerman. At that time, he described the condition of his knee as follows: "It pains all the time, and I can't take a high step. I can go up an ordinary step but I can't take a high step and put any pressure on it. It is swelled all the time. * * * I usually soak it in hot epsom salts. It just hurts all the time. If I walk two or three squares (blocks) it just tired me out. It just begins to hurt that much more."

In support of his claim for damages, plaintiff called Dr. Anson H. Bingham, a professor of orthopedic surgery as a witness. He examined Williams shortly before the trial, and his findings were these: "There was local tenderness over the inner side of the knee through which the cartilage of the knee was removed; that is, the internal cartilage or inner meniscas as they call it. The knee was somewhat swollen. The circumference showed a huge swelling across the patella or knee cap. The left knee could be flexed * * * an angle

of 50 degrees on actual measurement. The other knee, the normal knee, could be bent to an angle of 30 degrees, showing a loss of 20 degrees of normal flexion of the joint. On attempting forced flexion beyond 50 degrees the motion was painful and resulted in muscle spasm at that point."

The above quotation was copied verbatim from the transcript of the testimony taken before Judge Timmerman. Nevertheless, I incline to the belief that it does not set forth the statements of the witness with complete accuracy. I say this, inasmuch as Dr. Bingham, on cross examination, said that while one knee was slightly larger than the other, the difference was "hardly noticeable." This would indicate that the reporter's transcript to the effect that there was "a large swelling across the patella or knee cap" is erroneous. Furthermore, if the transcript is correct with respect to the degree by which Williams' two knees could be flexed, it would appear that the right knee was capable of less flexion than the one that was injured.

Dr. Allison H. Dugdale, a specialist in traumatic surgery, testified concerning the conditions of plaintiff's left knee, on behalf of defendant. He had examined Williams on October 18, 1944, and at the time of trial. In the course of his testimony, he said: " * * * all you can see now is a very faint linear scar; it is about 3 or 3¼ inches long, and it parallels the inner border of the kneecap. You can only see it upon close inspection. Outside of that you can't see any abnormality. There is no swelling or—both measuring 14 inches in circumference; there is no limitation of motion of the knee. He has complete extension and flexion. * * * As far as his operation has gone he has had a very successful result. I can't find any permanency. I do not believe there is any save that I do know that from past experience an individual, when he has his cartilage out, probably could not walk as long or perhaps be quite as strenuous as with the knee that has the cartilage in. In other words, it does not take quite as much gaff. Outside of that he has a perfectly good knee and can do anything with it. If he can do a purser's job he certainly can be an able bodied seaman because the purser is probably the busiest man on the ship. * * * They are up and down ladders and carrying messages to the officers. They have to be pretty much on their feet. * * * following an operation of this type, a reasonable period of time for convalescence is four to six months; this man went back unusually early."

In the light of this testimony, I am satisfied that Williams has had a normal recovery from his injury, and the operation that followed it, and that he has suffered no permanent disability therefrom.

Whether or not respondent should be held liable for the injury, and if so, the amount of libellant's loss and damage should now be determined. Unfortunately, on the question of liability, there is no evidence from any witness, who saw the accident, to support libellant's version of what occurred. Despite respondent's efforts to find the men who were working with Williams at the time of his fall, it has been impossible to locate them. It is necessary, therefore, to reach a decision without the benefit of their testimony. I proceed, consequently, to examine the depositions of the Captain and the first mate of the Thomas R. Marshall.

Shortly after the accident was reported to the Captain, he went to inspect the launch which, at that time, hung on its davits. He said he saw "nothing * * * detrimental or * * * dangerous. There was no oil on the boat or in any part of the boat except the motor * * * There was no oil on the seats; the thwarts were all clean."

Having heard that Williams slipped on the third seat from the launch's bow, he carefully inspected it but found no oil. It should be noted at this piont, and as bearing on the weight to be given to libellant's testimony that, according to the captain, "Mr. Williams always conducted himself in a conscientious way in his work. He was an able seaman and conducted himself properly."

When the first mate, who also saw the launch following libellant's injury, was asked if he saw "any dirt or oil or grease in the boat," he replied, "Just around the engine. Naturally, there's bound to be oil around the engine." Notwithstanding, he

774

saw no grease splattered about the inside of the boat immediately before she was sent ashore. Furthermore, none was in evidence when she returned, and was hoisted to her davits. There was "no oil, except around the engine," which, the mate thought was located between the fourth and fifth thwart. The mate further says that when Williams reported his injury to him, he merely said he had "stepped on the thwart and hurt his knee. He did not mention oil." The mate added, "There was no oil on the seats."

On cross examination, the mate was asked: "So * * * you are willing to swear that the boat was clean, that there was no water in the boat and no grease in the boat?" The reply was: "There was no grease, except around the engine. There is bound to be a little bit, the same as in an automobile." He, however, had nothing to do with oil or grease or with the engine itself. Matters, such as these, he said, lay within the jurisdiction of the engine department.

Upon the state of the proof submitted to me, I think it altogether probable that, during the launch's trips between the ship and shore, the engine, as libellant says, may not have been "working right * * * and was giving out oil." If this were so, this defect may well have been the cause of the injury that came to libellant, and I shall find such to have been the fact. This, of course, will entitle Williams to a recovery. Nevertheless, I think he is entitled only to no more than half damages. Such oil as had been spattered about the boat must have been obvious to him and he, as an experienced seaman, should have taken note of its presence, and acted accordingly. From all that appears, he had full opportunity to perform his duties leisurely, and with complete appreciation of the conditions surrounding him. He should, therefore, have been careful to avoid the danger of stepping on a portion of the boat that was spattered with oil. Not having done so, his recovery, on account of physical injuries, will be limited to $2,500. If he be awarded the further sum of $500 for maintenance and cure, and loss of wages, he will, I think, be fully compensated.

A decree to this effect may be submitted.